UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PHILLIP E. CARROLL and DENICE M. CARROLL, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) No. 09 C 6595 <br> ) Judge Andrea R. Wood <br> ) <br> ) <br> ) <br> ) |

**UNITED STATES' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Findings of Fact**

**I.  ACCIDENT**

1.  The accident occurred in the northbound lanes of I-94 at approximately 1:44 p.m. on August 12, 2006 (a Saturday). Ex. 1; Tr. 45.[1]

    **A. Atlas' Testimony**

2.  At the time of the accident, then-Sergeant Atlas was a United States Army recruiter headquartered at the Great Lakes Naval Base. Tr. 46.

3.  As part of his job duties, Atlas travelled in and around Chicago and the surrounding suburbs to interact with the public and to recruit men and women of eligible age to enlist in the Army. *Id.*

4.  On the morning of the collision, Atlas was working at a Military Entrance Processing Station (MEPS) in Des Plaines, Illinois, processing an applicant who did not

---

[1] "Tr." citations refer to the trial transcript by page number. "Ex." citations refer to exhibits included in the parties' joint exhibit binder.

meet eligibility requirements and would require a waiver before being able to enlist. Tr. 47-48. The waiver paperwork necessary to process his application was at the Great Lakes Naval Base headquarters, and Atlas was in route there when the accident occurred. *Id.*

5.    Because the applicant required a waiver, he would not be eligible to join the military that day. Thus, Atlas did not need to be at the Great Lakes headquarters at any particular time. Tr. 47. Nor did he have an appointment with anybody at headquarters. Tr. 48.

6.    The MEPS is located off River Road in Des Plaines, Illinois, and Atlas intended to take I-94 north and then take Route 137 (Buckley Road) to the Great Lakes Naval Base. Tr. 48-49. Atlas had driven the route before and was very familiar with it. Tr. 18.

7.    Atlas was driving a Dodge Stratus that morning, the vehicle normally assigned to Army recruiters. Tr. 49-50. He had no problem with the vehicle that day. Tr. 51. Nor was he eating or drinking while driving or using his cellphone. Tr. 51-52.

8.    At the section of the northbound I-94 where the accident occurred, there were three lanes, a shoulder on the left of the lanes, and an emergency lane to the right of the lanes. Ex. 1; Tr. 52. Atlas was driving in the left-hand lane adjacent to the shoulder prior to the collision (also referred to as lane 1). Ex. 1; Tr. 52.

9.    Traffic conditions were stop-and-go at the time the collision occurred and had been that way for over thirty minutes. Tr. 53-54.

10.    Atlas observed a vehicle passing him on his driver's side (in the shoulder) and seconds later attempt to merge in front of him in his lane of traffic. Tr. 54-55.

11. Atlas slammed on his brakes in an attempt to avoid the accident, but the two vehicles collided in a heavy impact. Tr. 54-55.

12. Atlas estimated he only had a split second from when he first saw the vehicle coming on his driver's side in the shoulder, to when the impact happened. Tr. 21-23.

13. Atlas estimated he was travelling at 30 mph immediately before the accident, and the vehicle passing him was travelling 10-15 mph faster than he was. Tr. 24-25.

14. After impact, Atlas' Dodge Stratus began to spin and he estimated it made a 360-degree turn before coming to a stop. Tr. 56-57.

15. After he came to a stop, he saw the vehicle he had collided with and recognized it to be a Ford Mustang. Tr. 57.

16. Twenty to thirty minutes after the collision, a state trooper responding to the scene of the accident asked Atlas how the accident had happened. Atlas reported: "I was driving towards my headquarters when a vehicle coming off the shoulder of the road and cut me off." Tr. 60.

17. Atlas testified he did not drive on the left-hand shoulder at any point prior to the collision and would not do so because he understood it to be illegal. Tr. 61.

    **B. Denice Carroll's Testimony**

18. Denice Carroll was driving a Ford Mustang on the day of the collision. Ex. 1.

19. Denice and her husband, Phillip Carroll, were on their way to a family gathering in Rockton, Illinois, near the Wisconsin border, from their home in Oak Lawn, Illinois. Tr. 64, 73-74. Carroll had never driven up to Rockton before. *Id.*

20. The family gathering began at 1:30 p.m., and Carroll intended to take I-294 to I-90/94. Tr. 74.

21. The collision occurred around 1:44 p.m., 0.01 miles south of Mile Post 58 in Vernon Township, Lake County. Ex. 1.

22. Right before impact, Phillip Carroll was on the phone with their son to have him look up directions for them. Tr. 67-68; 76. At impact, Denice Carroll was drinking a coke that her husband had handed her. Tr. 75.

23. Carroll testified she was stopped in lane 1, closest to the center of the highway, when her vehicle was rear-ended. Tr. 68-69.

24. Carroll testified that she was never driving in the shoulder prior to the collision. Tr. 70.

25. Carroll testified that she never saw observed any vehicles in the left-hand shoulder prior to the collision. Tr. 78.

26. The first time Carroll saw Atlas' Dodge Stratus was after impact, when her Ford Mustang came to a rest in the emergency lane. Tr. 70, 78.

### C. Phillip Carroll's Testimony

27. Immediately prior to the accident, Phillip Carroll was on the phone with his son to "see if we could make a turn, get off the crowded road we were on." Tr. 84-85.

28. Philip Carroll first saw the Dodge Status after the collision and was not clear on what actually caused the accident. Tr. 90-91.

### D. Eyewitness Kary Sampson's Testimony

29. Kary Sampson was an eyewitness to the collision. Ex. 1.

30. Sampson was driving a van in the left-hand lane closest to the median strip in the southbound lane of I-94, and could see the northbound lanes of traffic from his seat. Tr. 99-100.

31. Sampson had the window down and observed a Mustang enter the shoulder. Tr. 100. There was nothing obstructing his view. Tr. 100.

32. Sampson saw the Mustang shoot into the shoulder travelling between 45 and 55 mph. Tr. 101. The rest of the traffic Sampson observed in the northbound lanes was starting to slow down. Tr. 100.

33. Sampson observed the Mustang drive on the shoulder for three to five seconds and pass a few cars before cutting back into traffic. Tr. 101.

34. Sampson observed the Mustang collide with a vehicle when it attempted to reenter traffic and then witnessed it shooting across the lanes of traffic. Tr. 101-102.

35. Sampson stopped his van in the southbound shoulder because he could tell "it was going to be a bad accident," and approached the Mustang after it came to a rest. Tr. 102-103.

36. In court, Sampson identified Phillip Carroll as the passenger of the Mustang he observed that day. Tr. 103-104.

37. In court, Sampson also identified Atlas as the occupant of the first car that the Carroll's Mustang collided with. Tr. 106.

38.     Fifteen to twenty minutes after the collision, Sampson reported to a state trooper at the scene that he had seen "the Mustang cut down the shoulder, come back into traffic, and just kind of start ping-ponging off of cars." Tr. 109.

39.     There is no doubt in Sampson's mind that he saw a Mustang driving in the shoulder. He is certain about it. Tr. 100, 139.

1.  **EXPERT OPINIONS**

    A.  **Plaintiffs' Expert**

        (1)  **Shawn Gyroke**

            a.  **Liability Opinion**

40.     Plaintiff's expert Shawn Gyroke did not read the deposition transcript of then-Sergeant Atlas prior to forming his original opinions in this case, which included an opinion that Atlas was driving in the shoulder. Tr. 159.

41.     During his cross-examination, Gyroke admitted that after recently reading Atlas' deposition, there was no way to discern who was in the center median pre-impact from an accident reconstructionist analysis. Tr. 171-172; Tr. 185-186. The only evidence of pre-impact behavior in this case was witness testimony.

42.     Gyroke admitted that the only way to conclude that Atlas was driving in the shoulder prior to impact would be to discredit eyewitness Sampson's testimony. Tr. 170.

    B.  **Defense Expert**

        (1)  **Michael Bracki**

43.     Michael Bracki is a certified accident reconstructionist with fifteen years of experience. Tr. 197-199. He is the co-founder of a forensic engineering firm specializing in accident investigation and reconstruction.

44. In preparing his opinions in this case, Bracki reviewed the depositions of Denice and Phillip Carroll, Kary Sampson, Steven Atlas, and plaintiff's expert Shawn Gyorke. He also reviewed the available vehicles and exemplars of the subject vehicles to take measurements. Tr. 200.

### a. Liability Opinions

45. Based on the limited physical evidence in this case, Bracki agreed with Gyorke that the only way to identify which vehicle was passing in the shoulder prior to impact would be through witness testimony. Tr. 203-204. Accident reconstruction analysis could not determine pre-impact behavior in this case. Tr. 219.

## CONCLUSIONS OF LAW

### A. Legal Standards Under the Federal Tort Claims Act

46. The Federal Tort Claims Act waives the United States' sovereign immunity for suits initiated by persons injured by the negligence of federal employees acting within the scope of their employment. *Employers Ins. of Wasau v. United States*, 27 F.3d 245, 247 (7th Cir. 1994). The FTCA creates liability "under circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

47. Under Illinois law, plaintiffs alleging negligence must produce evidence proving that defendant owed them a duty of care, that the duty was breached by defendant, and that the breach was the proximate cause of the injuries suffered by plaintiffs. *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071 (Ill. 1999).

48. Plaintiffs bear the burden of proving every necessary element of their negligence case by a preponderance of the evidence. *Redmond v. Socha*, 837 N.E.2d 883,

897 (Ill. 2005). The burden to prove all the elements of a negligence claim remains on the plaintiffs throughout the proceedings and it is not the defendant's burden to disprove negligence. *Krywin v. Chicago, Transit Authority*, 938 N.E.2d 440, 451 (Ill. 2010).

    **I.**    **Plaintiffs failed to establish that the United States breached the duty of care to drive reasonably.**

    49.    Under Illinois law, the occurrence of a rear-end collision, without more, does not establish that the responsible driver was negligent. *Black v. Laggren*, 313 Ill. App. 3d 39, 44 (2000). Nor does it establish that the responsible driver was operating his vehicle in any specifically improper way, such as following too closely or driving too fast for conditions. *Stone v. Lyons*, 178 Ill.App.3d 448, 451 (1988).

    50.    Here, there is no real dispute that Atlas' Dodge Status collided with the Carrolls' Mustang. What is in dispute is the events that preceded the impact. The uncontroverted witness testimony, however, fails to establish that Atlas was ever improperly driving in the shoulder prior to this collision or that he was negligent in any other way.

    51.    A witness may only testify from his or her personal knowledge. Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Personal knowledge may include reasonable inferences, but those inferences must be "grounded in observation or other personal first-hand experience and not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Visser v. Packer Eng.'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (*en banc*).

52. The eyewitness testimony to the actual crash clearly establishes that the United States was not at fault and that the blame rests solely with the Carrolls. The evidence is uncontroverted that Atlas was never seen driving in the shoulder. Neither plaintiff saw or observed Atlas driving in any negligent matter. No other witness did either. Plaintiffs' assumption that Atlas must have been driving in the shoulder is unsupported and pure speculation.

53. In fact, the evidence supports a finding that Denice Carroll was driving unreasonably in the shoulder prior to the collision and negligently attempted to merge back into traffic without using due care. Both Atlas and Sampson testified consistently that they personally observed the Carrolls' Mustang driving in the shoulder and then merge into traffic suddenly. Atlas testified that he had little time to react. He acted as any reasonable person would by applying his brakes and attempting to avoid the collision. The record is devoid of any evidence that he was travelling at an unreasonable speed or following the vehicle in front of him at an unreasonable distance.

54. Similarly, both retained experts agreed that the only way to determine the pre-impact behavior of the vehicles would be to rely on witness testimony. Again, there is no witness testimony that Atlas ever drove negligently in this case. Thus, the facts presented are insufficient to establish by the preponderance of the evidence that the United States (thru Atlas) was operating its vehicle with less than reasonable care.

**Conclusion**

Based on the totality of the evidence presented in the trial in this matter, the court should enter judgment in favor of the United States and against the plaintiffs.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By: s/ Harpreet K. Chahal
HARPREET K. CHAHAL
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5342
harpreet.chahal@usdoj.gov